Filed 12/10/15  In re Sophia M. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| IN RE SOPHIA M. et al., Persons Coming Under the Juvenile Court Law | D068450 |
| SAN DIEGO COUNTY HEALTH & HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> MONIQUE R. et al., <br><br> Defendants and Appellants. | (San Diego County Super. Ct. No. NJ14724CDEFG) |

APPEALS from an order of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant Lionel M.

Monica Vogelmann, under appointment by the Court of Appeal, for Defendant and Appellant Monique R.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Richard F. Arroyo for Minor Carmelo M.

Dependency Legal Group of San Diego and Maria Diaz for Minors Sophia M., Justice M., Isabella M. and Rosalie M.

This is an appeal following the juvenile court's order terminating the parental rights of appellants Monique R. and Lionel M. to their five children: Sophia M., Carmelo M., Justice M., Isabella M. and Rosalie M.[1] Both appellants contend that the juvenile court erred in concluding that (1) Carmelo and Isabella were adoptable; (2) the beneficial parent relationship exception to adoption found in Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i) did not apply;[2] and (3) the sibling relationship exception to adoption found in section 366.26, subdivision (c)(1)(B)(v) did not apply. We conclude that appellants' contentions are without merit, and we accordingly affirm the order terminating parental rights.

_____

[1]     We refer to the parents and children by their first names to preserve confidentiality, and we intend no disrespect in doing so.

[2]     Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

I

FACTUAL AND PROCEDURAL BACKGROUND

In September 2012, following ongoing domestic violence by Lionel against Monique that occurred in front of the children, the San Diego County Health and Human Services Agency (the Agency) filed juvenile dependency petitions under section 300 for Sophia, Carmelo, Justice, Isabella and Rosalie.[3]  At the time of the petitions Sophia was six years old; Carmelo was four years old; Justice was three years old; Isabella was two years old; and Rosalie was one year old.  At the October 1, 2012 detention hearing, the juvenile court ordered that the children be detained outside of the home and found Lionel to be the presumed father.

At the January 2013 jurisdictional hearing, the juvenile court ordered the children to be dependents of the court and placed them in the approved home of a relative. Monique and Lionel were provided with services to address their domestic violence and parenting issues.

In July 2013, at the six-month review hearing, the juvenile court ordered the Agency to provide both Monique and Lionel with continued reunification services until the 12-month review hearing, although it also found that Lionel had not made substantial progress with his case plan.

_____

[3]     Petitions were also filed regarding two other of Monique's children with another father, namely Selena, who was 15 years old at the time of the petition; and Christopher, who was eight years old at the time of the petition.  This appeal does not involve the dispositions as to Selena and Christopher.

The juvenile court held a combined 12- and 18-month review hearing on June 9, 2014, at which it terminated Monique's and Lionel's reunification services and set a permanency planning hearing. As the juvenile court explained, it would not be safe to return the children to the parents because of ongoing incidents of domestic violence between them.

The juvenile court held a permanency planning hearing on July 16, 2015, and found that the children were adoptable, terminated the parental rights of Monique and Lionel, and selected adoption as the permanent plan. At the permanency planning hearing, the juvenile court specifically considered and rejected the applicability of the beneficial parent relationship and the sibling bond exception to adoption.

II

DISCUSSION

A.     *Substantial Evidence Supports the Juvenile Court's Finding That Carmelo and Isabella Were Likely to Be Adopted*

Monique and Lionel both argue that their parental rights to Carmelo and Isabella should not have been terminated because the evidence does not support the juvenile court's finding that those two children are likely to be adopted.

The juvenile court may terminate parental rights if it determines by clear and convincing evidence the minor is likely to be adopted within a reasonable time. (§ 366.26, subd. (c)(1); *In re Zeth S.* (2003) 31 Cal.4th 396, 406; *In re B.D.* (2008) 159 Cal.App.4th 1218, 1231.) " 'The issue of adoptability . . . focuses on the minor, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a

4

person willing to adopt the minor.' " (*Zeth S.*, at p. 406.) "On review, we determine whether the record contains substantial evidence from which the court could find clear and convincing evidence that the child was likely to be adopted within a reasonable time. . . . We give the court's adoptability finding the benefit of every reasonable inference and resolve any evidentiary conflicts in favor of the judgment of the trial court." (*In re B.D.*, at p. 1232, citations omitted.)

Monique's and Lionel's arguments concerning the adoptability of Carmelo and Isabella are based on the history of those children's caregiver placements during the pendency of the dependency proceedings. We accordingly begin with a focus on that history.

Initially, all five children were placed in a relative's home. In August 2013, due to Carmelo's behaviors, he was moved to the same nonrelative extended family member home that was caring for his older sister Selena. Carmelo was moved from that second placement in December 2013 because the caregivers were expecting a child of their own, and he was placed in the foster home of Robin and John. In a September 2014 report, the Agency stated that Robin and John wished to adopt Carmelo. However, in March 2015 Carmelo was removed from his placement with Robin and John because they moved to a smaller apartment that would not accommodate a foster child. Carmelo was temporarily placed at the Polinsky Children's Center, where he was exhibiting aggressive behavior. In March 2015, Carmelo was placed in the home of Desiree and Martha. The Agency reported that those caregivers wanted to adopt Carmelo, having initially accepted the placement with the intention of adopting. In July 2015, the social worker testified that

Carmelo was blossoming in the home of Desiree and Martha, with his behaviors having greatly improved as a result of the stability provided by that placement and the individual attention he was receiving.

All four girls were moved to foster home placements in May 2014 because the relative caregivers were no longer able to provide care. By August 2014, all four girls were in the same foster home. However, in January 2015, Isabella was removed from the foster home because she seriously injured another child in the caregivers' in-home daycare. Isabella was placed in a different foster home, and according to the Agency's March 2015 report, those caregivers wished to adopt Isabella. In April 2015, Isabella was moved to a different foster home, and as of the time of the permanency planning hearing, those caregivers wanted to adopt Isabella.

Monique and Lionel argue that because of Isabella's and Carmelo's histories of negative behaviors that caused them to be removed from earlier placements, and because Isabella and Carmelo have been in their current placements for only a relatively short period, the evidence does not support a finding that Carmelo and Isabella are likely to be adopted. As we will explain, we disagree.

The Agency's reports provide ample evidence to support a finding that Carmelo and Isabella are likely to be adopted despite their placement history. Most importantly, both children were in current placements with families who wanted to adopt them. "[T]he fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In

6

other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent or by some other family." (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649-1650, italics omitted.) Significantly too, although Carmelo and Isabella had past failures in their foster placements because of aggressive behavior, even though those caregivers originally expressed a desire to adopt, the Agency reported that in the stability of the current placements, neither Carmelo nor Isabella were showing aggressive behavior at home or school and the current caregivers wanted to adopt the children. (See *In re Michael G.* (2012) 203 Cal.App.4th 580, 592-593 (*Michael G.*) [child's aggressive and defiant behaviors did not require a finding he was unadoptable as those behaviors significantly diminished while he was in the care of a stable, nurturing and attentive caregiver, permitting the reasonable inference that an equally dedicated adoptive parent could manage the child's behaviors].) Further, as the social worker explained, the intention of the current caregivers to adopt Carmelo was more solid than the intention of the last caregivers, as the current caregivers accepted the placement with the intention of adoption, as opposed to the previous caregivers who started out as a temporary foster placement but then expressed a desire to adopt.

Even if the current caregivers were eventually unable to adopt the children, Carmelo and Isabella were both considered generally adoptable, as described by the Agency, due to their "developmental and physical characteristics, . . . personalities, . . . good general health, positive behaviors, intelligence and . . . ethnic background," and Isabella had the added benefit of her young age. The Agency provided information that

7

in the event the children's current caregivers were not able to adopt them, as of May 18, 2015, there were 40 possible families in San Diego County approved to adopt a child with Isabella's characteristics, and 19 possible families in San Diego County approved to adopt a child with Carmelo's characteristics.

Based on this evidence, we find substantial support in the record for the juvenile court's finding that both Carmelo and Isabella were likely to be adopted.

B.      *Monique and Lionel Did Not Establish the Applicability of the Beneficial Parent Relationship Exception to Adoption*

We next consider Monique's and Lionel's arguments that the juvenile court erred in concluding that the beneficial relationship exception to adoption was not established.

1.      *Applicable Law*

At a permanency planning hearing, once the juvenile court finds by clear and convincing evidence that the child is likely to be adopted within a reasonable time, the court is *required* to terminate parental rights and select adoption as the permanent plan, unless the parent shows that termination of parental rights would be detrimental to the child under one of several statutory exceptions. (*Michael G.*, *supra*, 203 Cal.App.4th at p. 589.) One of these statutory exceptions is the beneficial relationship exception to adoption, which applies when it would be detrimental to the child to terminate parental rights in that "[t]he parents have maintained *regular visitation* and contact with the child and *the child would benefit from continuing the relationship*." (§ 366.26,

8

subd. (c)(1)(B)(i), italics added.)[4] The burden is on the party seeking to establish the

beneficial relationship exception to produce evidence establishing the exception is

applicable. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314 (*Bailey J.*).) Once the

juvenile court finds that a parent has met his or her burden to establish the requirements

of the beneficial relationship exception are present, the juvenile court may chose a

permanent plan other than adoption if it finds the beneficial relationship to be "a

compelling reason for determining that termination would be detrimental to the child."

(§ 366.26, subd. (c)(1)(B); see *Bailey J.*, at p. 1314.)

We apply a substantial evidence standard of review to a juvenile court's findings

on whether the requirements for the beneficial relationship exception have been

established. (*Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).)[5]

---

[4]    "Regular visitation exists where the parents visit consistently and to the extent permitted by court orders." (*In re I.R.* (2014) 226 Cal.App.4th 201, 212.) "Sporadic visitation is insufficient to satisfy the first prong of the parent-child relationship exception to adoption." (*In re C.F.* (2011) 193 Cal.App.4th 549, 554.)

[5]    As the Agency notes, there is some debate in recent case law on the proper standard of review regarding the beneficial relationship exception. *In re J.C.* (2014) 226 Cal.App.4th 503 concluded that the substantial evidence standard of review applied to the factual issues of whether the parent maintained regular visitation and contact with the child and whether the parent proved he or she had a beneficial parental relationship with the child, but as to the weighing test, in which the juvenile court balances the strength of the parent-child relationship against the benefits the child would derive from adoption to decide whether the relationship is a compelling reason to chose a permanent plan other than adoption, the court applied the abuse of discretion standard of review to "[t]his ' " . . . quintessentially" discretionary decision.' " (*Id.* at p. 531; see *Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315; see also *In re Anthony B.* (2015) 239 Cal.App.4th 389, 395 ["We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would

2. *The Basis for the Juvenile Court's Ruling*

As we have explained, there are two parts to establishing the beneficial

relationship exception, namely that the parent "has maintained regular visitation with the

child *and* that the child would benefit from continuing the relationship." (*In re*

*Marcelo B.* (2012) 209 Cal.App.4th 635, 643, italics added.) In this case, focusing on

Monique's and Lionel's visitation history, the juvenile court noted it was "questionable"

whether visitation was "regular and consistent."[6] However, choosing instead to base its

ruling on the second part of the beneficial relationship exception, the juvenile court

concluded that "even if you assume the visitation . . . ha[s] been regular and consistent,"

---

be detrimental to the child."].) Here, our conclusion would be the same regarding the inapplicability of the beneficial relationship exception, regardless of whether we apply a substantial evidence or an abuse of discretion standard of review.

[6]      As to Monique's visitation, the juvenile court found that "[Monique] does visit the children, at times, throughout the course of the case. The visits have not necessarily been regular and consistent. There are times when mother has missed visits or cut visits short or, during the visits, pays attention to other individuals, and not the children." As to Lionel's visitation, the juvenile court stated, "the father does visit the children . . . , but his visits tend to be unreliable and no shows. Of late, the father has been more regular and consistent." Evidence in the record supports the juvenile court's characterization of the parents' visitation as inconsistent. For example, on August 16, 2014, Monique did not show up for the weekly supervised visit and did not call for a week, explaining later that she did not show up for the visit because she had an altercation with Lionel. Between June 27 and September 5, 2014, Lionel missed four visits. In a March 2015 report, the Agency reported that Monique missed several visits, and specifically in December 2014, Monique did not attend any visits with the girls and did not call them. Regarding Monique's visits with Carmelo, weeks would go by with no word from Monique, with the result that Monique failed to visit Carmelo for several months. The same report states that Lionel's attendance at visits had been inconsistent.

10

the relationship of the parents with the children did not outweigh the benefits of adoption and permanence.

Because the juvenile court based its ruling on a finding that the relationship between the children and the parents was not the type of relationship necessary for the application of the beneficial relationship exception, we focus on whether substantial evidence supports that finding rather than on whether visitation was regular and consistent.

3. *Neither Monique Nor Lionel Established a Beneficial Relationship with the Children Within the Meaning of the Statutory Exception to Adoption*

The Agency described Monique's relationship with the children in a September 2014 report. As the Agency reported, "[t]he children do have a relationship with the mother that has been maintained through continued visits. However, that relationship has begun to unravel as the mother misses visits, cuts visits short, or gives her attention to other people in the area. The relationship the children have with their mother does not resemble one of a parent who meets [their] day[-]to[-]day needs" and "is similar to one they may have with an extended family member that takes them to do something fun once in awhile," and they "seem indifferent about her in between visits." In reports prepared after September 2014, the Agency described pleasant and positive visits between Monique and the children, but also described that the children separated from Monique easily at the end of visits and were anxious to rejoin their caregivers. At the permanency planning hearing on July 16, 2015, the social worker testified that Monique had a positive relationship with the children, but it was not a child/parent bond. Based on

11

this evidence, the juvenile court found as to Monique, that "mother is seen as an extended family member, but does not hold a parental role for these children," rejecting the applicability of the beneficial relationship exception.

With respect to Lionel's relationship with the children, the Agency reported in September 2014, "that relationship has begun to deteriorate as more time goes by. The children are beginning to view their father as unreliable, and are becoming angry when he does not show up as promised. They have become indifferent about going to the visits as they do not know if the father will show up or not." During the visits, "[t]hey ignore the father for the most part, and are happy to see the caregivers after the visit. The relationship with the children has become similar to a favorite extended family member that brings them gifts every time they see him." The Agency's reports after September 2014 contain descriptions of Lionel's chronic lateness to visits, which impacted the quality of the visits and his interactions with the children, and Lionel's inability to handle the supervision of the children during visits. Based on this evidence, the juvenile court concluded that Lionel occupies the role of "an extended family member who brings gifts to the children or other items of conversation, but who does not have a parent/child bond," and accordingly rejected the applicability of the beneficial relationship exception.

As we have explained, to show the applicability of the beneficial relationship exception to adoption, Monique and Lionel were each required to establish that they had a relationship with the children that the children would benefit from continuing. Here, substantial evidence supports the juvenile court's finding that neither Monique nor Lionel established the existence of a such a relationship.

12

The statutory phrase "benefit from continuing the relationship" (§ 366.26, subd. (c)(1)(B)(i)) refers to a parent-child relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

To meet the burden of proof to establish a beneficial relationship, "the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits—the parent must show that he or she occupies a parental role in the life of the child." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527; see *In re Jason J.* (2009) 175 Cal.App.4th 922, 936-937 (*Jason J.*); *In re Derek W.* (1999) 73 Cal.App.4th 823, 827 (*Derek W.*).) The evidence must establish more than merely "a loving and happy relationship" (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419), and the parent must be more than " 'a friendly visitor.' " (*Jason J.*, at p. 938.) "A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree, but that does not meet the child's need for a parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) "[I]t is only in an extraordinary case that preservation of the

13

parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

Here, although Monique and Lionel had a loving relationship with the children, substantial evidence supports the juvenile court's findings that neither parent had a beneficial parent relationship within the meaning of the statutory exception to adoption. As we have explained, the Agency reported that both Monique and Lionel generally had pleasant and positive visits with the children, but evidence showed that the children did not look to them to meet the type of needs a parent would satisfy. Based on this evidence, the juvenile court reasonably could conclude that both Monique and Lionel did not establish they "occup[y] a parental role in the life of the child[ren]" (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1527), and that the parents' relationship to the children "bears no resemblance to the sort of consistent, daily nurturing that marks a parental relationship." (*Derek W.*, *supra*, 73 Cal.App.4th at p. 827.) The beneficial relationship exception does not apply, as "[t]here is no evidence [the children] ha[ve] any needs only [the parents] can satisfy, or that [they] ha[ve] the type of emotional attachment to [the parents] that would cause [the children] to be greatly harmed if parental rights were terminated." (*Jason J.*, *supra*, 175 Cal.App.4th at p. 938.)

We accordingly conclude that neither Monique nor Lionel have successfully challenged the juvenile court's determination that the beneficial relationship to adoption is inapplicable here.

14

C.      *Monique and Lionel Did Not Establish the Applicability of the Sibling Relationship Exception to Adoption*

Finally, we consider whether Monique and Lionel established the sibling relationship exception to adoption.  That exception applies when terminating parental rights would be detrimental to the child because "[t]here would be substantial interference with [the] child's sibling relationship . . . ."  (§ 366.26, subd. (c)(1)(B)(v).)  The sibling relationship exception focuses on the possible detriment to the child or children who are being considered for adoption, not any other siblings.  (*In re Celine R.* (2003) 31 Cal.4th 45, 54.)  "In enacting this exception, the [L]egislature was concerned with preserving long-standing relationships between siblings which serve as anchors for dependent children whose lives are in turmoil."  (*In re Erik P.* (2002) 104 Cal.App.4th 395, 404.)  "To show a substantial interference with a sibling relationship the parent must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child."  (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 952.)  Factors relevant to the analysis include whether the child and the sibling were raised together in the same home, whether they shared significant common experiences, whether they have a close and strong bond, and whether continued contact with the sibling is in the child's best interests compared to the benefit of legal permanence through adoption.  (§ 366.26, subd. (c)(1)(B)(v).)  The " ' "sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption" ' " (*In re Naomi P.* (2005) 132 Cal.App.4th 808, 823), and "the application of this exception will be rare, particularly

15

when the proceedings concern young children whose needs for a competent, caring and stable parent are paramount" (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014).

We apply a substantial evidence standard of review to the factual issue of whether termination of parental rights would cause substantial interference with a sibling relationship. (*In re L. Y. L.*, *supra*, 101 Cal.App.4th at p. 947.)[7]

As relevant to the sibling relationship exception, the Agency reported that Rosalie, Sophia and Justice were placed with the same caregivers, who wanted to adopt them. By virtue of being in the same household, those three siblings would maintain a close sibling bond. Isabella and Carmelo were both placed by themselves due to behaviors they exhibited when placed in larger sibling groups. However, Isabella and Carmelo were thriving in their current individual placements, where they could obtain individual attention. In addition, the caregivers of all of the children were committed to maintaining the family connection of the siblings, having instituted regular visits between all of the children.

Based on this evidence, the juvenile court concluded that the sibling relationship exception was not established. The court noted that the current caregivers were

---

7      As is the case with the beneficial parental relationship exception, to the extent that the juvenile court exercises its discretion to determine whether substantial interference with a sibling relationship constitutes a compelling reason for determining that termination would be detrimental to the child, the Agency contends that we should apply an abuse of discretion standard of review. (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315 [applying a hybrid standard of review in both the sibling exception and beneficial parent relationship exception to adoption].) We need not resolve that issue, as our conclusion would be the same under either a substantial evidence or abuse of discretion standard of review.

committed to maintaining a relationship between the siblings, and that in any event, the bond between the children and each of their siblings, including the siblings who were not part of the dependency proceedings at the time (i.e., Christopher, Selena, and the children's adult half-sister), did not outweigh the benefits of adoption for the children, who needed stability in their lives.

The sibling relationship exception to adoption is applicable only when there is *substantial* interference with the sibling relationship. (§ 366.26, subd. (c)(1)(B)(v).) Because the children's prospective adoptive parents are committed to maintaining sibling contact and three of the children are placed together, the juvenile court reasonably could find that termination of Monique's and Lionel's parental rights would not cause a substantial interference with the sibling relationship between the children. (*In re Megan S.* (2002) 104 Cal.App.4th 247, 254 [when the social worker planned to place the child in one of 25 possible adoptive homes that would allow sibling contact, there would be no substantial interference with the sibling relationship].)

Further, as there is no guarantee that the prospective adoptive parents will maintain contact between all of the siblings, it is also relevant to consider whether, even without that ongoing contact, the benefits of adoption would outweigh the preservation of sibling bonds. Here, the juvenile court was within its discretion to determine that due to the trauma experienced by *all* of the children through the course of the dependency proceedings, the stability that the children would finally gain through adoptive placements would outweigh any detriment to them from losing the benefits of their sibling relationships. (*In re L. Y. L.*, *supra*, 101 Cal.App.4th at pp. 952-953.) Further, in

17

particular with respect to Isabella and Carmelo, as we have explained, they were thriving in their current individual placements where they could obtain individual care instead of using aggressive behavior to get attention, making their placement without their other siblings an additional benefit to their development and well being that would outweigh any loss of the benefits of sibling relationships.

## DISPOSITION

The order terminating parental rights is affirmed.

IRION, J.

WE CONCUR:

NARES, Acting P. J.

McINTYRE, J.

18